# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------------------------x
DENNIS SPAULDING,                     :
                                      :
        Petitioner,                   :
                                      :
v.                                    :        Civ. No. 3:16-CV-01062 (AWT)
                                      :
UNITED STATES OF AMERICA,             :
                                      :
        Respondent.                   :
                                      :
-----------------------------------------------x
```

## RULING ON MOTION TO
## VACATE, SET ASIDE OR CORRECT SENTENCE

Petitioner Dennis Spaulding ("Spaulding"), proceeding pro se, filed a motion pursuant to 28

U.S.C. § 2255 to vacate, set aside or correct his sentence.  He claims that his trial attorney

provided him with ineffective assistance of counsel with respect to each of the charges against

him by conducting an inadequate pretrial investigation, by not making use of certain testimony or

other evidence that Spaulding believes should have been used at trial, and/or by not objecting to

certain statements made by the prosecution at trial.  For the reasons set forth below, his motion is

being denied without a hearing.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

On September 25, 2012, a grand jury returned a 12-count superseding indictment against

East Haven Police Department ("EHPD") officers Spaulding, David Cari and Jason Zullo. Zullo

pleaded guilty to one count of obstruction of justice by preparation of a false police report.

Spaulding and Cari went to trial on the charges against them. On October 21, 2013, the jury

found each of them guilty on all counts against them. Spaulding was convicted of one count of

conspiracy to violate constitutional rights, in violation of 18 U.S.C. § 241 (Count One); one

count of deprivation of civil rights by the use of excessive force, in violation of 18 U.S.C. § 242 (Count Five); two counts of deprivation of civil rights by false arrest, in violation of 18 U.S.C. § 242 (Counts Six and Nine); and two counts of obstruction of justice by preparation of false police reports, in violation of 18 U.S.C. § 1519 (Counts Seven and Ten).

Spaulding and Cari each moved for a new trial and for a judgment of acquittal. The court denied these motions and, on January 23, 2014, the court sentenced Spaulding to a sentence of, inter alia, 60 months in prison.

Spaulding appealed, as did Cari. On appeal, they contended, among other appellate issues, that there was insufficient evidence to support their convictions, error in evidentiary rulings, improper statements by the government in closing argument, and procedural error at sentencing. On November 23, 2015, the Second Circuit denied Spaulding's and Cari's claims and affirmed their convictions and sentences. See United States v. Spaulding, 631 F. App'x 5, 8 (2d Cir. 2015), cert. denied sub nom. Cari v. United States, 136 S. Ct. 1680 (2016).

The government's evidence at trial established that, beginning as early as 2008, Spaulding and Zullo began a concerted campaign of harassing and intimidating Latino business owners and their customers in East Haven. Communications between Spaulding and Zullo demonstrated that they were motivated by anti-immigrant bias. Fellow officer David Cari joined the conspiracy when he falsely arrested Father James Manship, an advocate for the victims of Spaulding's and Zullo's abuse, and then prepared a false police report to justify the arrest.

In August 2008, based on concerns raised by another EHPD officer, then-Lieutenant Henry Butler met with and advised Spaulding about the racial profiling laws in Connecticut, making clear to Spaulding that it was illegal to target individuals based on race or ethnicity. Despite this warning from his superior officer, Spaulding continued his pattern of discrimination against Latino residents in East Haven.

With respect to Spaulding and Cari, the superseding indictment, and the evidence at trial, focused primarily on three incidents. The first two incidents involved Latino victims who were arrested by Spaulding without probable cause. Spaulding assaulted one of the victims, which served as the basis for Spaulding's conviction for use of excessive force. The third incident involved Father Manship, who Cari arrested without probable cause; this served as the basis for Cari's conviction on Count Eleven (false arrest) and Count Twelve (obstruction of justice). All three incidents were part of the larger conspiracy to violate the constitutional rights of East Haven's Latino residents and Father Manship, as charged in Count One.

**A.      Counts Five, Six and Seven: Arrests of Moises Marin Without Probable Cause, Use of Excessive Force Against Marin, and Preparation of a False Arrest Report**

Moises Marin is a native of Ecuador and a United States citizen who owned and operated La Bamba, an Ecuadorian restaurant located in East Haven. Marin testified to the jury about a history of harassment and intimidation by Spaulding of his customers, many of whom were Latino. In addition, an individual in the EHPD also harassed Marin by reporting him to the State's liquor commission for alleged violations of his liquor license.

To document the harassment, Marin followed the advice of the State's liquor commission representative and sought to document Spaulding's harassment by photographing his improper conduct. On the evening of November 21, 2008, Marin was informed that Spaulding was harassing some of his customers who had out-of-state license plates. Marin walked outside, approached Spaulding, and asked him to stop harassing his customers. In response, Spaulding laughed. Marin retrieved his camera from the restaurant and then took two photographs of Spaulding and his squad car. When Spaulding realized that Marin had photographed him and his squad car, Spaulding ran to Marin, told him he was under arrest, and pushed him to the ground. Marin testified at trial that Spaulding repeatedly kicked him and cursed at him during the arrest.

After Spaulding put Marin in the squad car, he took Marin to the police station. During the drive, Spaulding told him that Spaulding did not want Latino-owned businesses operating in East Haven. At the police station, Spaulding took Marin's camera, deleted the two photos that Marin had taken, and then threw the camera, rendering it inoperable. Marin was then fingerprinted and photographed for booking; the booking photo shows some of his injuries. Spaulding told Marin to wash his face, and then placed him in a jail cell.

Meanwhile, Marin's sister, Wesfalia Rocha, went to the East Haven police station to ask about her brother. At the station, Rocha saw three male officers and one female officer. When Rocha approached the window to inquire about her brother, she was told to wait. While she was waiting, she heard a male voice say: "'Fucking Spanish people.'" Case No. 3:12-cr-00017-AWT, Tr. vol. II, 317 (Doc. No. 548 at 79:14). According to Rocha, the officers then laughed. Spaulding was among these officers at the station, but Rocha could not identify Spaulding as the speaker of the derogatory statement.

Almost an hour after Rocha arrived at the EHPD station, Marin was released. He testified that he was in significant pain and was fearful that, because his back was hurt, he would be disabled. When Rocha saw her brother, she walked outside with him and asked another brother, who had accompanied her to the station, to call for an ambulance. Before the ambulance arrived, Rocha photographed Marin's injuries. The photographs of Marin's injuries, as well as his blood-stained clothes from that evening, were submitted as evidence at trial. An ambulance arrived in front of the police station and transported Marin to the hospital.

The hospital records indicate that Marin was pushed to the ground, and state that Marin was assaulted, suffered a lip laceration and suffered contusions. Although Marin testified that Spaulding had kicked him repeatedly, the emergency room records do not indicate that Marin was kicked.

Spaulding prepared a police report regarding Marin's arrest on November 21, 2008. That report contains several statements that were contradicted by other evidence. For example, the report states that on the night of his arrest, Marin was accompanied by three other men and had "flagged down" Spaulding, and that when Spaulding rolled down his window, Marin became irate and started yelling very loudly and throwing his hands in the air. According to Spaulding's report, Marin was yelling, "'You fucking police tow everybodies [sic] car.' 'You know everyone that comes here has no license.' 'You know everybody is illegal, they are only in this count[r]y to work.'" Gov't's 2255 Resp., Ex. A ("Doc. No. 11-2") at 72. When he testified, however, Marin denied that he was accompanied by anyone, denied flagging down Spaulding, and denied yelling or making any of the statements attributed to him. In fact, Marin testified that the expletive attributed to him in Spaulding's report was the same expletive that Spaulding used several times when speaking to him.

Spaulding's report also states that because Marin was yelling at Spaulding, a crowd had started to form around Spaulding's police car, and that, in response, Spaulding got out of his car and ordered the crowd to disperse. But Marin testifed that no crowd ever formed, and that the only time Spaulding got out of his car was to follow Marin after Marin photographed him. Also, the report states that Marin resisted arrest, but Marin denied resisting arrest. Finally, the report states that Marin's actions resulted in a crowd forming around Spaulding and that an unknown male pulled on Marin's arm in an attempt to free Marin from Spaulding's grasp. Marin also contradicted that statement.

After the arrest, Marin appeared in state court and was granted "accelerated rehabilitation," the equivalent of a six-month probationary period after which the charges were dismissed. After Marin's arrest, Spaulding began to follow him and twice stopped him without any proper reason. Marin became frightened and concerned that if he got a ticket or was arrested

again, he could lose his liquor license and his business. Consequently, he went to Ecuador for four months to avoid any further contact with Spaulding.

Counts Five, Six and Seven charged Spaulding for his conduct in connection with the arrest of Marin. Count Five charged that he used excessive force against Marin, in violation of 18 U.S.C. § 242. Count Six charged Spaulding with false arrest, in violation of 18 U.S.C. § 242, and Count Seven charged Spaulding with obstruction of justice by preparation of a false police report about Marin's arrest, in violation of 18 U.S.C. § 1519.

### B. Counts Nine and Ten: Arrests Jose Luis Alvarracin and John Espinosa Without Probable Cause and Preparation of a False Police Report

On January 21, 2009, four friends, Jose Luis Alvarracin, John Espinosa, Xavier Criollo and Wellington Salinas, gathered at the house where Espinosa and Alvarracin lived. All four men were born in Ecuador; Espinosa was a United States citizen. After a brief discussion, they decided to go to La Bamba for dinner. Salinas drove but did not have a driver's license; Alvarracin and Espinosa rode in the back seat. While they were driving to La Bamba, Spaulding began to follow them. When they pulled into the La Bamba parking lot, Spaulding turned on the lights of his police car. After Salinas stopped the car in the parking lot, Spaulding approached the driver's side of the car.

When Spaulding asked Salinas for his license and registration, Salinas explained that he did not have a license, but handed Spaulding the car registration and his New Haven identification card. Criollo, who was sitting in the front passenger seat, handed Spaulding his driver's license. Espinosa testified that Spaulding looked at the license, said it was "not good." Case No. 3:12-cr-00017-AWT, Tr. vol. V, 817-18 (Doc. No. 569 at 84:16, 85:2).  According to Alvarracin, Spaulding added, "All you fucking Spanish drivers drive without a license."  Gov't's 2255 Resp., App. ("Doc. No. 11-1") at 186:22-23 (Tr. vol. VI, 1095).  When Alvarracin asked Spaulding why he was treating them that way, Spaulding responded, "Do you want to be

arrested?"  Doc. No. 11-1 at 188:7 (Tr. vol. VI, 1097). When Alvarracin said that they had done nothing wrong, Spaulding placed him under arrest.

By this time, Officer Zullo had arrived on the scene and searched Criollo. Criollo, who was now outside the car, repeatedly asked the officers to return his license. In response, Spaulding told Criollo that he was going to be arrested and then arrested him. Around the same time, Espinosa asked Spaulding if he could exit the car. After Spaulding responded in the affirmative, Espinosa got out. Then, when Espinosa asked the officers why they were arresting Criollo, Spaulding arrested Espinosa too. At some point after that, Salinas was arrested and placed in the patrol car with Espinosa.

All four arrestees—Espinosa, Criollo, Salinas, and Alvarracin—were transported to the East Haven police station. At the police station, Officer Zullo pushed Alvarracin into a wall, pulled him off, and then pushed his head into the wall. Alvarracin fell to ground, bleeding from his forehead and asking for help. Another police officer came to assist Alvarracin and placed him in a cell. Alvarracin asked for medical help, but instead of providing help, Zullo tried to grab Alvarracin through the cell bars and, in the process, ripped Alvarracin's shirt off. All four men spent the night in the jail because bail was set at $2,500 per person.

Spaulding prepared and filed a police report regarding the arrest of Alvarracin and Espinosa. Spaulding's arrest report for Alvarracin and Espinosa contains statements that were contradicted by the testimony of Espinosa and Alvarracin. The report states that after Salinas was arrested, Alvarracin and Espinosa became belligerent with the officers, which both men denied in their testimony. Alvarracin and Espinosa also denied the report's description of them as hanging out the rear seat window yelling and using expletives. Finally, the report states that "numerous patrons" were standing outside the restaurant watching as Alvarracin and Espinosa continued to scream and yell.  Doc. No. 11-2 at 76. Again, both men contradicted that statement, testifying

that although a few people had come out of the restaurant, Alvarracin and Espinosa never screamed or yelled.

All four men who were arrested at La Bamba on January 21, 2009 appeared in state court the following day. The state court judge released them without requiring them to post bail. The charges against them were nolled.

### C. Count One: Participation in a Conspiracy to Violate Civil Rights

In addition to the above-describe incidents, Spaulding was involved in other incidents, along with Zullo and Cari, that provided additional evidence of Spaulding's participation in a conspiracy to violate the constitutional rights of East Haven residents.

In 2008, Father Manship, the pastor of Saint Rose of Lima Parish in New Haven, began to hear from Latino parishioners about their problems with the EHPD. On January 22, 2009, i.e., the day after Alvarracin, Espinosa, Criollo and Salinas were arrested, they met with Father Manship at La Bamba. The four men gave Father Manship information about their arrests and their treatment by Zullo and Spaulding. Thereafter, Father Manship conducted a series of meetings at his church where he invited faculty and students from Yale Law School ("YLS") to assist him in strategizing about how to improve the Latino community's relationship with the EHPD. As a result, Father Manship met with the mayor of East Haven. In addition, Father Manship and others decided to gather evidence by documenting stories and videotaping police misconduct.

On February 13, 2009, Father Manship videotaped Spaulding's interaction with the Latino driver of a car that appeared to have been stopped by Spaulding. Spaulding saw Father Manship videotaping him and told Manship that he had every right to videotape but had to do it from a safe distance. After videotaping the traffic stop, Father Manship spoke to the driver and reviewed the ticket that Spaulding had issued to the driver. Thereafter, Father Manship

approached Spaulding and asked why Spaulding put "white" as the race of the driver on the ticket instead of "Hispanic".

Six days later, on February 19, 2009, a series of events occurred at "My Country Store" in East Haven. My Country Store is a small grocery owned and operated by an Ecuadorian couple, Marcia Chacon and her husband. On that day, Chacon's brother was sitting with a friend in Chacon's car outside the store. Spaulding approached the car, arrested Chacon's brother and placed him in a police car, and then had Chacon's car towed. Other police officers, including Cari, arrived at the store while the car was being towed. When Chacon's friend and husband sought to question the police, Spaulding threatened the friend with arrest and Cari threatened Chacon's husband with arrest. Chacon had her cousin call Father Manship for help.

After Spaulding released Chacon's brother with a ticket, Spaulding went inside the store. There, Spaulding noticed license plates that were screwed into the back wall inside the store. Three or four other officers, including Cari, arrived at the store and told Chacon's husband that the license plates had to be taken down. Spaulding reiterated that message to Chacon's husband. As Chacon's husband and a friend removed the license plates, all of the officers except Cari and Spaulding left the store.

While Cari and Spaulding were supervising the removal of the license plates, Father Manship entered the store. Spaulding saw Father Manship, approached him, and reminded him about their conversation six days earlier in which he had told Father Manship to stay a safe distance away. Father Manship began to videotape what Spaulding and Cari were doing. Cari looked at Father Manship and asked him, "Sir, what are you doing? . . . Is there a reason why you have a camera on me?" Doc. No. 11-1 at 315:20-21, 316:11-12 (Tr. vol. XIII, 2502-03). Father Manship told Cari that he was filming what was happening in the store. Cari asked, "Why is that?", and Father Manship responded that he was filming to document what happened. Doc. No.

11-1 at 317:3-4 (Tr. vol. XIII, 2506). Cari approached Father Manship, saying "Well, I'll tell you what—what I'm going to do with that camera," and then arrested him. Doc. No. 11-1 at 325:11-12 (Tr. vol. XIII, 2516. After Father Manship's arrest, several officers, including Spaulding, Zullo and Cari, came into the store and attempted, unsuccessfully, to retrieve a surveillance video from the store.

Sgt. John Miller took Father Manship to the police station, where he was photographed, fingerprinted and charged with interference and disorderly conduct. Father Manship was released without a bond, but his camera remained in police custody. He was ordered to appear in state court on March 4, 2009. At Father Manship's arraignment, his attorneys moved to preserve the video camera and the recording made by the priest. They subsequently moved to dismiss the case, and the motion was granted.

After Father Manship's arrest, Zullo and Spaulding continued to harass members of the Latino community and their advocates. Chacon testified, for example, that after a press conference in March 2009 during which Father Manship's attorneys released his video to the press, she went to her store. That evening around 8:00 p.m., she noticed a police car parked outside her store; the police car remained there until late that night. When she and her husband eventually left in their car at around 11:00 p.m., they were stopped almost immediately by Zullo. Zullo told Chacon's husband that his license and registration did not match but eventually let them go.

Segundo Aguayza, an East Haven resident, testified that on January 9, 2009, Spaulding came to his house with an animal control officer after receiving complaints about a dog. Aguayza testified that Spaulding walked into the property without permission and that, after Aguayza told Spaulding that he was trespassing, Spaulding said that he hates immigrants and that they lower real estate prices.

Reina Leon, who owned and operated Los Amigos grocery store across from La Bamba, also testified about the harassment she encountered. Leon explained that in late February or March 2009, she began filming Spaulding because he was harassing her customers directly outside her store. She provided the video to the press. On one occasion, Spaulding saw Leon videotaping him from inside her store. He walked into her store and demanded the video recorder. When Leon did not give it to him, Spaulding searched the store for the camera. He was unable to find it and ultimately left the store.

Also, numerous "chats" between Spaulding and Zullo on their car computers demonstrated racial animus and antipathy toward Latino businesses in East Haven.

## II.     LEGAL STANDARD

Federal prisoners can challenge a criminal sentence pursuant to 28 U.S.C. § 2255 "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in complete miscarriage of justice." Graziano v. United States, 83 F.3d 587, 590 (2d Cir. 1996) (internal citation and quotation marks omitted).  A petitioner may obtain review of his claims if he has raised them at trial or on direct appeal; if he did not, such a procedural default can be overcome by a showing of "cause" and "prejudice", Ciak v. United States, 59 F.3d 296, 302 (2d Cir. 1995) abrogated on other grounds by Mickens v. Taylor, 535 U.S. 162 (2002) (quoting Wainwright v. Sykes, 433 U.S. 72, 87 (1977)), or a showing of constitutionally ineffective assistance of counsel, see Murray v. Carrier, 477 U.S. 478, 487-88 (1986); Johnson v. United States, 313 F.3d 815, 817 (2d Cir. 2002).

Section 2255 provides that a district court should grant a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). However, "[t]he language of the statute does not strip the district courts of all discretion to exercise their common sense."  Machibroda v. United States, 368 U.S. 487, 495

(1962). In making its determination regarding the necessity for a hearing, a district court may draw upon its personal knowledge and recollection of the case. See Blackledge v. Allison, 431 U.S. 63, 74 n.4 (1997); United States v. Aiello, 900 F.2d 528, 534 (2d Cir. 1990). Thus, a § 2255 petition, or any part of it, may be dismissed without a hearing if, after a review of the record, the court determines that the motion is without merit because the allegations are insufficient as a matter of law.

To prevail on an ineffective assistance of counsel claim, the petitioner must show, first, that his "counsel's representation fell below an objective standard of reasonableness" and, second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).

> To satisfy the first, or "performance," prong, the defendant must show that counsel's performance was "outside the wide range of professionally competent assistance," [Strickland, 466 U.S.] at 690, and to satisfy the second, or "prejudice," prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

Brown v. Artuz, 124 F.3d 73, 79-80 (2d Cir. 1997). In this context, "there is no relevant difference between an [attorney's] act of commission and an act of omission." Padilla v. Kentucky, 559 U.S. 356, 370 (2010) (internal quotation marks omitted). Rather, "[t]he court must then determine whether, in light of all the circumstances, the identified acts *or omissions* were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690 (emphasis added). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 1403 (internal quotation marks omitted). "That requires a substantial, not just conceivable, likelihood of a different result." Id. (internal quotation marks omitted). To satisfy the prejudice element of the Strickland test, a petitioner "must make more than a bare allegation" of prejudice. United States v. Horne, 987 F.2d 833, 836 (D.C. Cir. 1993). "The court

'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (quoting Strickland, 466 U.S. at 689). Courts should not second-guess the decisions made by defense counsel on tactical and strategic matters. See United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998). "The court's central concern is not with 'grad[ing] counsel's performance,' but with discerning 'whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" Aguirre, 912 F.2d at 561 (quoting Strickland, 466 U.S. at 696-67) (internal citations omitted)).

## III. DISCUSSION

Spaulding claims that his trial attorney provided him with ineffective assistance of counsel. He contends that his counsel should have taken a series of additional steps to provide a more effective defense, including interviewing additional witnesses, seeking additional evidence, offering at trial additional testimony and other evidence, and/or objecting to certain statements by the prosecutor during the trial. He makes these claims with respect to Counts Five, Six and Seven, which are the charges arising out of the arrest and assault of Moises Marin; with respect to Counts Nine and Ten, which are the charges arising out of the arrest of Jose Luis Alvarracin; and with respect to the conspiracy charge in Count One.

None of Spaulding's claims satisfies either prong of the Strickland test. With respect to the first prong, he has not shown that his attorney's representation fell outside the wide range of reasonable professional assistance. Spaulding's attorney put on an effective defense that included much of the evidence and arguments that Spaulding now claims he ignored before and

during the trial. In addition, Spaulding fails to support his claims with affidavits, exhibits or citations to the record to establish the factual basis for his arguments. His sole documentary support for his petition is a series of e-mail messages authored by him in which he discusses, inter alia, his dissatisfaction with his attorney. Second, even assuming *arguendo* that Spaulding's attorney was ineffective, Spaulding has not shown that he suffered any prejudice because he has failed to show a reasonable probability that the outcome of the trial would have been different. In his submissions, Spaulding ignores the testimony of the numerous witnesses, as well as the video, photographic and documentary evidence, that served to establish his guilt beyond a reasonable doubt.

### A. Counts Five, Six and Seven: The Arrest of Moises Marin

Spaulding asserts five claims of ineffective representation in connection with charges stemming from the arrest and assault of Moises Marin, i.e., Counts Five, Six and Seven. First, he contends that his attorney failed to introduce into evidence a medical report made after Marin's arrest which indicated that Marin had not been punched or kicked, and that he failed to interview the author of the report. Second, Spaulding claims that his attorney failed to introduce the testimony of Marin's brother, or call Marin's brother as a witness, and that the testimony of Marin's brother should have contradicted Marin's factual account of the incident. Third, Spaulding contends his attorney should have introduced testimony from an East Haven firefighter who stated that he believed Marin was faking a neck injury. Fourth, Spaulding contends that his attorney should have interviewed three East Haven Police Officers named "Kenny," "Casio" and "Depalma," who were involved in the arrest and processing of Marin. Fifth, Spaulding argues that his attorney should have reviewed Marin's camera to verify that it had been damaged by Spaulding.

To rebut the charges of use of excessive force and obstruction of justice stemming from the arrest of Moises Marin, Spaulding's counsel relied principally on the theory that Marin lied about the encounter and exaggerated the extent of his injuries. In his closing argument, Spaulding's attorney pointed to the following evidence to support this theory: (1) the testimony of Marin's brother, Mario Marin, which may have contradicted Marin's testimony; (2) Marin's conduct at the hospital, including a hospital report the attorney argued showed that Marin had not been punched or kicked, that Marin had told the doctor that he was not in much pain, and that Marin had provided erroneous identifying information to the hospital; (3) the presence of cars with out-of-state license plates in the parking lot of La Bamba, which he argued showed probable cause existed for the arrest; and (4) there was no investigation of Spaulding's conduct at the time, which he argued showed Spaulding's police report could not have been evidence of obstruction of justice.

As to Spaulding's first claim, his contention that his attorney did not investigate or make use of the medical report stating that Marin had not been punched or kicked is factually inaccurate. The government introduced the report into evidence as an exhibit, and Spaulding's attorney explicitly referred to the report in his closing argument. Although Spaulding asserts that the author of the report should have been interviewed and called as a witness, he provides no affidavit and points to no evidence in the record suggesting that this witness's testimony would have helped the defense beyond merely confirming what was already in the written report.

As to Spaulding's second claim, it is also contradicted by the trial record. Explicitly relying on Mario Marin's testimony, Spaulding's attorney asserted in his closing argument that Mario Marin's testimony contradicted that of his brother in material respects, specifically, whether the victim turned around to face Spaulding and with respect to kicking and punching.

Spaulding does not identify what other arguments his attorney should have made regarding Mario Marin's testimony.

As to Spaulding's third and fourth claims, he provides no affidavit and points to no evidence in the record that, had his attorney called the firefighter and the three police officers as witnesses, the firefighter would have offered opinion testimony that Marin was faking a neck injury and the police officers would have offered testimony that contradicted Marin's account of events. With respect to the firefighter, his supposed opinion about Marin faking a neck injury would not have undermined the medical records and photographs that documented Marin's physical injuries. With respect to the three police officers, Spaulding does not specify what their supposed testimony would be, so the court has no basis for determining whether it could have been material. Consequently, there is no basis to conclude that these four witnesses would have aided Spaulding's defense, or that his attorney's failure to call them was an unprofessional error.

As to Spaulding's fifth claim, Marin's camera was actually entered into evidence at the trial and used in the direct examination of Marin, and the significant aspect of Marin's testimony was that Spaulding had deleted the pictures Marin had taken of Spaulding and his police car and then thrown the camera, not that the camera was broken as a consequence. In fact, Marin testified that, from the outside, the camera did not look broken at all. Rather, it simply could not be turned on anymore. Then, during cross examination, Spaulding's attorney used the camera in a line of questioning designed to attack Marin's credibility.

Moreover, even if Spaulding could show that his attorney's performance was deficient in any or all of the five ways he claims, he has not demonstrated prejudice. None of Spaulding's ineffectiveness allegations negate the factual basis for the jury's verdicts on the charges of wrongful arrest, obstruction of justice or use of excessive force. In addition to Marin's testimony, the government presented corroborating testimony from Mario Marin confirming that Spaulding

had pushed Marin to the ground, handcuffed him, kicked him in the ribs and shoved him into the police car, as well as from Marin's sister Rocha, who retrieved Marin from the police station and stated that he had an injury to his lip and that there was a lot of blood. Rocha took photographs of Marin's injuries that were admitted into evidence at trial, along with Marin's blood-stained clothes. In addition, while the hospital records stated that Marin was not punched or kicked, they did reflect that Marin was assaulted and suffered a lip laceration and contusions. The Second Circuit noted with respect to the government's evidence:

> At trial, Marin testified that immediately after Marin took two photographs of Spaulding's car, Spaulding ran up behind Marin, pushed Marin to the ground, and kicked Marin multiple times, before finally arresting him. Hospital records admitted into evidence indicated that Marin was assaulted and suffered contusions, and photographs taken by Marin's sister corroborated Marin's testimony as to the nature of his injuries. After the incident, Spaulding filed a police report claiming, *inter alia,* that Marin flagged down Spaulding, started yelling at Spaulding, and resisted arrest. Marin and his brother, who witnessed the scene, testified that the statements contained in the police report were false. The jury was entitled to credit the testimony supporting the Government's case and to discredit the statements in Spaulding's report.

Spaulding, 631 F. App'x at 8-9.

Taken together, the government's evidence established that Spaulding used excessive force against Marin, and then falsely arrested him and prepared a false police report. As to those steps Spaulding's attorney did not take, there is no reasonable likelihood that the trial would have turned out differently had Spaulding's attorney taken the steps Spaulding now argues that he should have with respect to Counts Five, Six, and Seven.

### B.  Counts Nine and Ten : The Arrest of Alvarracin and Espinosa

Spaulding asserts two claims of ineffective representation in connection with the charges stemming from the arrest of Jose Luis Alvarracin and John Espinosa, i.e. Counts Nine and Ten. First, Spaulding contends that his attorney should have interviewed the FBI agents who investigated the arrests, called the agents to testify and introduced their reports at trial. Second, Spaulding claims that his counsel failed to review police dispatch recordings that allegedly would

have helped his case by demonstrating that the arrestees were behaving aggressively and also by showing that a police officer named "Rybaruk," who testified at trial, did not witness Spaulding's conflict with the arrestees.

To rebut the false arrest and obstruction charges stemming from the incident with Alvarracin and Espinosa, Spaulding's attorney argued that the arrestees were drunk and belligerent, and also that Spaulding could not have obstructed justice because there was no pending investigation. As with the wrongful arrest of Marin, Spaulding provides no affidavit and points to no evidence in the record supporting his self-serving allegations.

Spaulding contends that his attorney should have interviewed the FBI agents who prepared a report about these arrests. He asserts that, by conducting interviews, his attorney would have identified inconsistent statements that would have inured to Spaulding's benefit. However, Spaulding does not identify these purported inconsistent statements and explain how they would have inured to his benefit, much less provide an affidavit or point to evidence in the record in support of his assertion.

Spaulding also contends that his attorney should have reviewed police dispatch recordings so that he could undermine the testimony of Officer Anthony Rybaruk. Rybaruk testified at trial that no one appeared belligerent when he arrived at the scene of the arrest, and that none of the officers there told him to be careful with Alvarracin when Rybaruk transported him to the police station. This testimony is actually consistent with Spaulding's assertion that Rybaruk was not present for the arrest of Alvarracin, Espinosa, Criollo and Salinas. Thus, no tactical advantage could have been gained by undermining this aspect of Rybaruk's testimony, so Spaulding's counsel cannot be faulted for not listening to the police dispatch tapes.

Moreover, even if Spaulding could show that his attorney's performance was deficient in either or both of these respects, he has not demonstrated prejudice because the jury convicted

Spaulding based largely on the testimony of Alvarracin and Espinosa, who testified about Spaulding's statements and actions during the incident. Spaulding has not shown that if his attorney had taken the steps he now complains were not taken, there is a reasonable likelihood that the jurors would have found the testimony of these witnesses as to what Spaulding said and did any less credible.

### C. **Count One : The Conspiracy Charge**

Spaulding points to seven omissions that he claims were unprofessional errors by his counsel in connection with the conspiracy charge in Count One. First, he contends that his lawyer did not adequately investigate that Spaulding was the recipient of the incriminating text messages from Zullo, not the sender of those messages. Second, he claims that his attorney failed to interview the animal control officer who was involved in the incident with Segundo Aguayza and that the animal control officer would have confirmed that they had been called to Aguayza's house because of a dog-related complaint. Third, Spaulding contends that his attorney should have called an expert witness to testify that, during a motor vehicle stop, police officers are instructed to arrest people who approach them without permission, and that this justified the arrest of Espinosa. Fourth, Spaulding claims that his attorney should have interviewed and called as a witness the person Spaulding arrested on February 19, 2009, outside My Country Store, even though the government did not call this person as a witness at trial. Fifth, Spaulding contends that his attorney should have investigated or brought to light the fact that he did not help Cari arrest Father Manship. Sixth, Spaulding contends that his lawyer should have investigated and discovered evidence that he was acting under orders from his superiors when he searched for the camera used by the owner of Los Amigos Grocery and tried to seize the video recording from My Country Store. Seventh, Spaulding contends that when Zullo stopped Marcia Chacon and her husband in March 2009, the stop could not have constituted harassment because there was a

discrepancy in Chacon's husband's license, and that Spaulding's attorney would have uncovered this fact had he undertaken an investigation.

To rebut the conspiracy charge in Count One, Spaulding's attorney made two principal arguments to the jury. First, he emphasized that the incriminating text messages were sent by Zullo, not Spaulding. Second, he argued that there was no racial animus on Spaulding's part, and that Spaulding's actions could be explained by his commitment to combatting license plate fraud in East Haven.

Thus, as to Spaulding's first claim, his attorney did in fact argue to the jury that Spaulding was the recipient, not the originator, of the incriminating texts. He emphasized to the jury that Officer Zullo made the off-color and demeaning statements and argued that Spaulding gave no response that reflected even tacit approval.

As to Spaulding's second claim, there was no dispute at trial about whether an animal control officer was called to Aguayza's home about a dog-related incident. The only evidence was that this was so.  In addition, Aguayza's testimony was offered by the government to establish that Spaulding had an abusive, racially charged argument with Aguayza.  Spaulding has offered no affidavit and points to no evidence in the record to suggest that the animal control officer would have offered testimony that would have made Aguayza's testimony less credible.

As to Spaulding's third claim, Spaulding has provided no affidavit from such an expert witness, describing the proffered testimony, to support his contention that standard police protocol called for Espinosa to be arrested after he got out of the car.  In any event, such expert testimony would have been immaterial because Espinosa testified that he asked for and was given permission to get out of the car, and that he was only arrested after he asked why Spaulding was arresting Criollo.  Thus, Spaulding cannot demonstrate prejudice with respect to this omission.

As to Spaulding's fourth claim, he gives no explanation of how interviewing and calling as a witness the person Spaulding arrested outside of My Country Store on February 19, 2009 would have helped the defense. This arrest was not listed in the indictment as one of the overt acts in the conspiracy, and this person was not called as a government witness. It was reasonable for defense counsel not to interview such an individual, and in any event, Spaulding has made no showing as to prejudice with respect to this omission.

As to Spaulding's fifth claim, the government did not elicit evidence or argue at trial that Spaulding had assisted Cari in arresting Father Manship. Rather, the opposite is true. The evidence showed that when Cari saw Father Manship filming the officers, Cari approached him and made a comment about the camera and then, acting independently, arrested Father Manship. There was nothing for defense counsel to further investigate or bring to light in this respect.

As to Spaulding's sixth claim, Spaulding provides no affidavit and points to no evidence to support his contention that he was acting under orders from his EHPD superiors when he tried to obtain the video cameras from My Country Store and from Los Amigos Grocery. In any event, it is undisputed that Spaulding sought to seize the camera from the owner of Los Amigos Grocery immediately after seeing her videotaping him from within the store, and that when Leon did not give it to him, Spaulding searched the store for the camera. It is also undisputed that Spaulding and other officers sought to obtain the surveillance video showing Father Manship's arrest from My Country Store. Thus, even if Spaulding could demonstrate that superior officers had directed him to obtain these video cameras, that fact would not absolve Spaulding in terms of his role in the conspiracy. Consequently, it was reasonable for Spaulding's attorney to not investigate whether Spaulding's superiors had directed him to take such actions, and in any event, Spaulding has made no showing of prejudice with respect to this omission.

As to Spaulding's seventh claim, he provides no affidavit and points to no evidence in the record to support his contention that Maria Chacon's husband's driver's license was not in the DMV computer. In any event, regardless of whether the driver's license was in the DMV computer, the point of Maria Chacon's testimony was that, after she attended a press conference at which Father Manship's attorneys released her video to the press, she returned to her store, and Zullo then waited three hours outside her store to conduct a traffic stop of Chacon and her husband. It was reasonable for Spaulding's attorney to not investigate whether that driver's license was in the DMV computer, and in any event, Spaulding has made no showing of prejudice with respect to this omission.

Moreover, even assuming arguendo that Spaulding could establish that his attorney's performance was deficient for the reasons he claims, Spaulding cannot show prejudice related to these seven allegations because the government introduced in its case-in-chief overwhelming evidence that Spaulding participated in a conspiracy to deprive certain Latino residents of East Haven of their constitutional rights. The Second Circuit summarized that evidence as follows:

> Drawing all inferences in favor of the government, the evidence establishes that starting in 2008, Spaulding and a fellow police officer, Jason Zullo, commenced a campaign in which they harassed Latino business owners and their customers in East Haven by targeting these businesses and intimidating patrons in a manner violative of Fourth Amendment rights. This evidence included the testimony of Moises Marin, the owner of an Ecuadorian restaurant in East Haven, who testified that Spaulding frequently came to his store with other officers to harass his Latino customers and that Spaulding was "always the one that was leading what [the other officers] did." Trial Tr. 491. José Luis Alvarracin, a local resident, likewise testified that Zullo and Spaulding together arrested him and several of his friends without cause, and that Zullo physically assaulted him after his arrest. In addition, Maria Chacon, the owner of another Ecuadorian business in East Haven, testified that Zullo, Cari, and several other officers were called in as "back-up" when Spaulding attempted to arrest Chacon's brother without cause, and video footage showed Zullo, Cari, and Spaulding attempting to recover surveillance video footage from Chacon's store after Father Manship was arrested without probable cause. The evidence also demonstrated that Spaulding, in furtherance of this conspiracy, violated the constitutional rights of Marin and José Luis Alvarracin by subjecting Marin to excessive force and by arresting both individuals without probable cause and then filing false police

reports regarding the arrest incidents. This and other evidence were sufficient to permit a rational trier of fact to conclude beyond a reasonable doubt that Spaulding knowingly participated in a conspiracy to violate constitutional rights.

Spaulding, 631 F. App'x at 8.  As to those steps Spaulding's attorney did not take, the court concludes that there is no reasonable likelihood that the jury would have rendered a different verdict if Spaulding's attorney had taken those steps.

### D.  Prejudicial Statements

Spaulding asserts in his petition that the government made a number of highly prejudicial statements, and that his attorney was ineffective for failing to object to these statements at trial. He alleges that, "[t]he Government repeatedly characterized the Petitioner's underlying actions as 'illegal searches', 'without probable cause', 'threats', 'harassment', and 'illegal acts', despite the fact that Petitioner acted in accordance with proper police procedures in all of the alleged acts, followed EHPD training and the orders of his supervisors." Memo. in Support of 2255 (Doc. No. 1-1) at 25. However, the government's theory of the case was that Spaulding had committed several illegal acts, threatened and harassed the Latino residents of East Haven, and conducted illegal searches and arrests. Spaulding does not identify the specific statements he believes were prejudicial and should have been objected to, but even if he had, he cannot show prejudice in light of the evidence at trial that he had engaged in such conduct.

### IV.    CONCLUSION

For the reasons set forth above, the motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 (Doc. No. 1) is hereby DENIED.  The court will not issue a certificate of appealability because Spaulding has not made a substantial showing of the denial of a constitutional right.  See 28 U.S.C. § 2253(c)(2).

The Clerk shall close this case.

It is so ordered.

Signed this 15th day of February 2018, at Hartford, Connecticut.

_____/s/AWT_____
Alvin W. Thompson
United States District Judge